## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **LOCKWOOD INTERNATIONAL, INC.,** | § | |
| *Plaintiff/Counter-Defendant,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **WELLS FARGO BANK, N.A., WELLS** | § | |
| **FARGO SECURITIES, LLC, AND** | § | |
| **TRUSTMARK NATIONAL BANK,** | § | |
| *Defendants/Counterclaimants/Third-* | § | |
| *Party Plaintiffs,* | § | **CIVIL ACTION NO. 3:17-CV-00365** |
| | § | |
| **v.** | § | |
| | § | |
| **LOCKWOOD ENTERPRISES, INC.,** | § | |
| **LMG MANUFACTURING, INC.,** | § | |
| **PIPING COMPONENTS, INC.,** | § | |
| **LOCKWOOD HOLDINGS, INC.,** | § | |
| **LH AVIATION, LLC,** | § | |
| **7807 EAGLE LANE LLC, AND** | § | |
| **MICHAEL F. LOCKWOOD,** | § | |
| *Third-Party Defendants.* | § | |

## WELLS FARGO BANK, N.A. AND TRUSTMARK NATIONAL BANK'S COUNTERCLAIM, THIRD-PARTY CLAIMS, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants Wells Fargo Bank, N.A. ("Wells Fargo") and Trustmark National Bank,

("Trustmark") file their counter- and third-party claims, complaining of Plaintiff Lockwood

International, Inc. and Third-Party Defendants Lockwood Enterprises, Inc., LMG

Manufacturing, Inc., Piping Components, Inc., Lockwood Holdings, Inc., LH Aviation, LLC,

7807 Eagle Lane LLC, and Michael F. Lockwood, and seeking emergency injunctive relief.

## INTRODUCTION

1.     Lockwood International, Inc. ("LII") is a supplier and distributor of valves, pipes

and fittings primarily for the petrochemical industry, oil and gas industry and construction

industry.  LII conducts business in Texas and maintains its principal Texas office in Harris

County, Texas.  LII and its related entities Lockwood Enterprises, Inc., LMG Manufacturing, Inc., and Piping Components, Inc. have defaulted under a $72 million secured, syndicated Revolving Line of Credit owed to Wells Fargo and Trustmark, and the debt has been accelerated. Lockwood Holdings, Inc., LH Aviation, LLC, 7807 Eagle Lane LLC, and Michael F. Lockwood are guarantors.

2.      Borrowers have actively interfered with the rights of Wells Fargo, as Administrative Agent, and the Lenders as secured creditors.  The Lenders have a perfected security interest in all of the Borrowers' assets in the United States, including but not limited to all accounts receivable, inventory and equipment.  Wells Fargo has recently learned that LII has transferred some of Borrowers' inventory – the Banks' collateral – to one of LII's creditors to satisfy LII's debt to that creditor because LII cannot pay its debt to such creditor.  These transfers are a blatant breach of LII's obligations to Wells Fargo and Trustmark, and jeopardize and deplete their collateral.

3.      Pursuant to its rights as a secured creditor, Wells Fargo, as Administrative Agent, notified Borrowers' account debtors that all payments due to Borrower should be sent to Wells Fargo per the Security Agreement.  Shortly after sending the notice to account debtors, Wells Fargo learned that on November 17, 2017, LII had instructed its account debtors to remit all payments to a deposit account held at Bank of America, a violation of its obligations under the relevant loan agreements.  Wells Fargo also learned that LII offered to indemnify one of its account debtors if it disregarded the notice sent by Wells Fargo and sent payments directly to LII instead of Wells Fargo.  Thus, not only is LII interfering with Lenders' rights, it is also actively encouraging account debtors to violate their obligation and responsibility under the Texas Uniform Commercial Code to turn over payments to Wells Fargo.

4.      Upon learning of these infractions, Wells Fargo made demand on Borrowers to cease and desist from (i) interfering with the Lenders' collateral and directing its account debtors to make payments to LII, and (ii) disposing of the Lenders' collateral, including but not limited to, transferring inventory to pay LII's debts.  Wells Fargo also demanded an accounting of all receivables diverted and inventory used to pay LII's debts.  Borrowers failed to provide the requested information and refused to provide assurances that they will cease such wrongful activity.  Borrowers *did* however admit that they received $650,000 outside of Wells Fargo. Thus, there is clearly a danger of ongoing violations and infractions by Borrowers and Michael Lockwood, the principal and Chief Executive Officer of Borrowers and Guarantors.

5.      Accordingly, it has become necessary to seek injunctive relief prohibiting Borrowers and Michael Lockwood from interfering with the Lenders' rights to their collateral. The Lenders do not have an adequate remedy at law because Borrowers are experiencing significant financial difficulties and may be on the brink of insolvency and incapable of responding in money damages.  Preserving and securing Lenders' collateral is necessary to preserve the status quo and remove the threat of potential loss of the collateral.

## PARTIES

6.      Defendant/Counterclaimant/Third-Party Plaintiff Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota as set forth in its articles of incorporation.

7.      Defendant/Counterclaimant/Third-Party Plaintiff Trustmark is a foreign financial institution with its principal place of business in Mississippi.

8.      Plaintiff/Counter-Defendant LII is a Texas corporation with its principal place of business in Harris County, Texas.

9.      Third-Party Defendant Lockwood Enterprises, Inc. ("Lockwood Enterprises") is a Texas corporation with its principal place of business in Harris County, Texas.  Lockwood Enterprises may be served via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

10.     Third-Party Defendant LMG Manufacturing, Inc. ("LMG Manufacturing") is a Texas corporation with its principal place of business in Harris County, Texas.  LMG Manufacturing may be served via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

11.     Third-Party Defendant Piping Components, Inc. ("Piping Components") is a Texas corporation with its principal place of business in Harris County, Texas.  Piping Components may be served via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

12.     Third-Party Defendant Lockwood Holdings, Inc. ("Lockwood Holdings") is a Texas corporation with its principal place of business in Harris County, Texas.  Lockwood Holdings may be served via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

13.     Third-Party Defendant Michael F. Lockwood ("Michael Lockwood") is a resident of Harris County, Texas.  He may be served at 14239 Indian Wells Drive, Houston, Texas 77069 or wherever he may be found.

14.     Third-Party Defendant LH Aviation LLC is a Texas limited liability company with its principal place of business in Harris County, Texas.  Upon information and belief, Michael Lockwood, a Texas citizen is the sole member of LH Aviation LLC, and accordingly, LH Aviation LLC is a citizen of Texas for diversity purposes.  LH Aviation LLC may be served

via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

15.     Third-Party Defendant 7807 Eagle Lane LLC is a Texas limited liability company with its principal place of business in Harris County, Texas.  Upon information and belief, MFL Properties LLC is the sole member of 7807 Eagle Lane LLC.  Upon information and belief Michael Lockwood, a Texas citizen, is the sole member of MFL Properties LLC.  Accordingly, 7807 Eagle Lane LLC is a citizen of Texas for diversity purposes.  7807 Eagle Lane LLC may be served via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper in this Court because the Counterclaim/Third-Party Claims arise out of the same transaction and occurrences that are the subjects of the Plaintiff's Original Complaint, and pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy, excluding costs and interest, exceeds $75,000 and the parties are citizens of different states.   Venue is appropriate in this district under 28 U.S.C. § 1391(b)(1) & (2).

## FACTUAL BACKGROUND

### BORROWERS' LENDING RELATIONSHIP WITH WELLS FARGO AND TRUSTMARK

#### *The Credit Agreement*

17.     LII, a supplier of valves, pipes and fittings largely for the oil and gas industry, entered into an amended and restated lending relationship with Wells Fargo and Trustmark in September 2015.  On February 27, 2017, LII, and its affiliated companies Lockwood Enterprises, LMG Manufacturing, and Piping Components (collectively, "Borrowers") entered into a Second Amendment to Amended and Restated Credit Agreement and Limited Waiver of Defaults (the "Credit Agreement") with Wells Fargo and Trustmark (collectively, "Lenders" or "Banks"),

whereby Lenders agreed to extend a Revolving Line of Credit in the amount of $72,000,000 to Borrowers.[1]  A true and correct copy of the Credit Agreement is attached hereto as *Exhibit 1*.  In addition to being a lender, Wells Fargo is also the Administrative Agent for the Lenders.  Wells Fargo's Revolving Line of Credit commitment percentage is 77.78% and Trustmark's commitment percentage is 22.22%.

*The Notes*

18.      In connection with the original credit agreement, Borrowers had entered into several promissory notes with Lenders, which continue to govern the lending relationship.  These include (i) a Revolving Credit Note between Borrowers and Wells Fargo on September 30, 2015, in the amount of $70,000,000 (the "Wells Fargo Note"), and (ii) a Revolving Credit Note between Borrowers and Trustmark on September 30, 2015, in the amount of $20,000,000 (the "Trustmark Note").[2]  Together the Wells Fargo Note and the Trustmark Note are referred to collectively herein as the "Notes", and true and correct copies are attached hereto as *Exhibits 2 and 3*, respectively.

*The Guaranty Agreements*

19.      Additionally, various third-party guaranty agreements were executed to secure the Indebtedness under the Credit Agreement and Notes.  These include unconditional guarantees by: (i) Michael F. Lockwood dated February 27, 2017 (the "Michael Lockwood Guaranty"); (ii) Lockwood Holdings, Inc. dated August 22, 2017 (the "Lockwood Holdings Guaranty"); (iii) LH Aviation LLC dated August 22, 2017 (the "LH Aviation Guaranty"); and (iv) 7807 Eagle Lane

---

[1]      The September 30, 2015 Amended and Restated Credit Agreement was amended by a further amendment dated July 31, 2016 and by the Credit Agreement.  The February 27, 2017 Credit Agreement is the operative Credit Agreement, as subsequently amended in August and September 2017.

[2]      The original revolving credit commitment in September 2015 was $90,000,000, which is why the Wells Fargo Note and Trustmark Note total that amount.  The commitment was reduced to $72,000,000 in the February 2017 Credit Agreement, and the Lenders' respective commitments were reflected as percentages - 77.78% for Wells Fargo and 22.22% for Trustmark.

LLC dated August 22, 2017 (the "Eagle Lane Guaranty").  Together the Michael Lockwood Guaranty, Lockwood Holdings Guaranty, LH Aviation Guaranty, and Eagle Lane Guaranty are referred to collectively herein as the "Guaranty Agreements," and true and correct copies are attached hereto as *Exhibits 4, 5, 6,* and *7*, respectively.  Together, Michael Lockwood, Lockwood Holdings, Inc., LH Aviation LLC, and 7807 Eagle Lane LLC are referred to collectively as the "Guarantors."

### *The Pledge and Security Agreements By Borrowers and Guarantors*

20.    To further secure the Indebtedness under the Credit Agreement and Notes, Borrowers executed and delivered, among other things, a Pledge and Security Agreement on September 30, 2015, which pledges an extensive array of assets as security and collateral for the Indebtedness (the "Security Agreement"), including but not limited to all accounts receivable, equipment and inventory.  In connection with executing their Guaranty Agreements, on August 21, 2017 the Guarantors executed a Pledge and Security Agreement Joinder No. 1, agreeing to join as Grantors under the Security Agreement and pledging their interest in the collateral covered by the Security Agreement (the "Security Agreement Joinder").  True and correct copies of the Security Agreement and the Security Agreement Joinder are attached hereto as *Exhibits 8* and *9*.[3]

**LII'S BUSINESS DETERIORATES, TRIGGERING VARIOUS EVENTS OF DEFAULT**

21.    Beginning in 2016, LII began to deteriorate financially due primarily to management issues and the slow-down in the energy sector that accounted for a large volume of LII's business.  In the first half of 2016, Michael Lockwood, the CEO, took a leave of absence from LII.  Prior to his departure Michael Lockwood put in place new management to continue

---

[3]    Additionally, Michael Lockwood pledged his equity interest in MFL Properties, LLC and Lockwood Holdings, Inc. (affiliated companies), and MFL Properties, LLC pledged its equity interest in 7807 Eagle Lane LLC (also an affiliated company).

operations during his absence.  LII's financial difficulties continued.  Demonstrative of the financial troubles, LII originally forecasted profitability for 2016, which forecast changed multiple times throughout the year, and ended in a significant loss for 2016.  Upon his return from his leave of absence, Michael Lockwood fired key personnel and claimed that the company had been mismanaged during his absence.

22.     In February 2017, Borrowers and Lenders entered into the Credit Agreement which, among other things, waived then existing covenant defaults and reset financial covenants. The Credit Agreement also reduced the Revolving Credit Commitment to $72 million, which would be paid down and incrementally decreased to $55 million by the third quarter of 2018, to address Borrowers' financial losses.  In response to its ongoing financial issues, LII retained multiple outside consulting, accounting, and financing firms to help it navigate through its financial and financial reporting troubles, but it was soon in default again.  After completing their review, the consultants presented a turnaround strategy to LII, which in turn LII presented to Lenders, that focused on making significant cuts to LII's operation expenses, executing extensive reforms, and reducing its loan obligations.

23.     However, the changes that LII implemented, or attempted to implement, did not right the ship, and the business continued its downward spiral throughout the spring and early summer of 2017.  By August 2017, LII was in continuing default of several financial covenants and financial reporting provisions in the Credit Agreement, including, but not limited to, (i) failing to meet the permanent reduction of the Revolving Credit Commitment as scheduled in the Credit Agreement; (ii) failing to timely deliver a forensic accountant report relating to alleged fraud uncovered at LII; (iii) failing to timely deliver financial statements and reports; (iv) breaching the Consolidated Total Liabilities to Consolidated Tangible Net Worth ratio; (v)

failing to meet the Consolidated EBITDA requirement; and (vi) failing to meet its minimum Asset Coverage Ratio.

*The Forbearance Agreements*

24.    As a result of these various defaults, Borrowers requested and Lenders agreed to forbear from exercising their rights and remedies under the Credit Agreement, and on August 16, 2017, the Borrowers, Guarantors, Lenders, and Administrative Agent executed the Forbearance Agreement and Third Amendment to Amended and Restated Credit Agreement (the "First Forbearance Agreement").    A true and correct copy of the First Forbearance Agreement is attached hereto as ***Exhibit 10***.    A comprehensive list of the then existing defaults is included as Annex A to the First Forbearance Agreement.    The Borrowers and Guarantors acknowledged that the listed events of default existed and were continuing.    *Id.* at § 3(a).    Further, as part of the First Forbearance Agreement, Borrowers agreed that all of their collections would be deposited in an account with Wells Fargo and that they would not open or maintain any deposit accounts at any other banks (except with respect to Limited Funds Foreign Accounts, which are not at issue in this case).    *Id.* at § 5(c).

25.    Yet, LII's problems continued and more events of default occurred.    As a result, at Borrowers' request, on September 29, 2017, Borrowers, Guarantors, Lenders, and the Administrative Agent entered into the Second Forbearance Agreement and Fourth Amendment to Amended and Restated Credit Agreement (the "Second Forbearance Agreement").    A true and correct copy of the Second Forbearance Agreement is attached hereto as ***Exhibit 11***.    A comprehensive list of the then existing defaults is included as Annex A to the Second Forbearance Agreement, which Borrowers and Guarantors again acknowledged were then existing and continuing.    *Id.* at § 4(a).    As with the First Forbearance Agreement, Borrowers

agreed to deposit all collections with Wells Fargo and to not open or maintain a deposit account at any other bank. *Id.* at § 6(c).

26.     Throughout the deterioration of LII's financial condition, Well's Fargo worked with LII and Michael Lockwood in their efforts to salvage the business, including but not limited to, allowing additional time to address defaults and repayments of the debt and for Michael Lockwood and advisors to solicit and entertain offers for the sale of the company as they requested deferring overdue and future interest payments, and allowing the use of the Lenders' cash collateral for working capital.   During that time, LII again failed to provide required financial statements and reports, and the statements which it did provide were marked "Draft" and LII could not vouch for the accuracy of those reports and statements.   At the end of the day, none of the existing defaults were remedied and LII's financial condition deteriorated further.

*Notice of Acceleration*

27.     The Second Forbearance Agreement expired by its own terms on October 31, 2017. *Id.* at § 2(f).   After the Second Forbearance Agreement expired, Borrowers failed to pay the accrued interest, as required under the Credit Agreement and Notes, resulting in an additional breach and default.   On November 27, 2017, Wells Fargo sent its Notice of Acceleration to Borrower and Guarantors, notifying them that all outstanding amounts under the Credit Agreement were due in full and demanding payment therefor.   A true and correct copy of the Notice of Acceleration is attached hereto as *Exhibit 12*.   Additionally, upon acceleration, Borrowers were required to immediately deposit in a cash collateral account an amount equal to the aggregate undrawn and unexpired amount of outstanding Letters of Credit, which as of the date of the Acceleration Notice totaled $808,591.86.[4]

---

[4]     In the Credit Agreement, Lenders had agreed to issue letters of credit for the benefit of Borrowers.   Credit Agreement at Article III, *Exhibit 1*.

28.     Despite demand, Borrowers and Guarantors have failed to pay the outstanding Indebtedness, and Borrowers have failed to deposit the cash collateral for the outstanding Letters of Credit as required.   As of December 21, 2017, the total outstanding principal owed by Borrowers and Guarantors is $55,147,373.48, and accrued interest is $1,753,841.03.   Interest continues to accrue on the Indebtedness.   Additionally, Borrowers and Guarantors owe $808,591.86 for the outstanding Letters of Credit and $18,199.89 in Letter of Credit commissions as of December 21, 2017.

29.     In addition to the breaches and defaults above, pursuant to Section 7.6 of the Credit Agreement Borrowers were required to maintain certain insurance coverage which named the Administrative Agent as a lender loss payee.   Despite demand, Borrowers failed to provide evidence of such insurance, and as a result of Borrowers' failure and default, Wells Fargo was forced to provide collateral protection insurance to protect its interests and the interests of Lenders.   Borrowers and Guarantors are liable for this expense and cost.

30.     The Credit Agreement, Notes, Guaranty Agreements, Security Agreement, Security Agreement Joinder, First Forbearance Agreement and Second Forbearance Agreement, and any other documents executed in connection with the Credit Agreement, are hereafter collectively referred to as the "Loan Documents."

## CAUSES OF ACTION

### COUNT I – SUIT ON NOTES/BREACH OF CONTRACT

31.     The factual allegations above are incorporated herein.

32.     Lenders sue Borrowers for breach of the Credit Agreement and Notes.   Lenders are and have been at all relevant times the lawful owners and holders of the obligations evidenced by the Credit Agreement and the Notes.   Borrowers and Lenders entered into a valid, enforceable Credit Agreement and Notes.   Lenders fully performed their duties under the Credit

Agreement and Notes, including advancing the loan proceeds to Borrowers. Borrowers promised to pay all amounts due and owing under the Credit Agreement and Notes, plus interest, costs, and expenses. Borrowers have failed to honor their obligations under the Credit Agreement and Notes and pay Lenders the amounts due and owing. Borrowers have further failed to honor their obligations under the Credit Agreement by failing to maintain certain financial and reporting covenants. These failures constitute material breaches of the Credit Agreement and Notes and have injured Lenders in the amount of the outstanding debt. Lenders now seek to recover from Borrowers all amounts due and owing under the Loan Documents.

## COUNT II – BREACH OF GUARANTY AGREEMENTS

33.     The factual allegations above are incorporated herein.

34.     Lenders sue Guarantors for breach of the Guaranty Agreements. Guarantors and Lenders entered into valid, enforceable Guaranty Agreements. Lenders fully performed their duties, including advancing the loan proceeds to Borrowers. Under the Guaranty Agreements, Guarantors personally guaranteed all amounts due and owing by Borrowers, plus interest, costs, and expenses. Borrowers have defaulted under the Credit Agreement and the Notes by failing to pay the required amounts as and when due.

35.     Despite such default and Lenders' written demand, Guarantors have failed to pay Lenders the amounts due and owing under the Guaranty Agreements. This failure constitutes a material breach of the Guaranty Agreements and has injured Lenders in the amount of the outstanding debt. Consequently, Guarantors are liable for the outstanding balance due under the Credit Agreement and the Notes, and Lenders seeks to recover from Guarantors all amounts due and owing under the Loan Documents.

## ATTORNEYS' FEES

36.     As a result of Borrowers' and Guarantors' defaults under their respective agreements with Lenders, Lenders engaged legal counsel to prosecute this action to collect the amounts due and owing under the Loan Documents and agreed to pay counsel its reasonable attorneys' fees and expenses. Pursuant to the Loan Documents and Chapter 38 of the Texas Civil Practices and Remedies Code, Lenders are entitled to recover their costs and reasonable attorneys' fees from Borrowers and Guarantors, for which they sue.

## CONDITIONS PRECEDENT

37.     All conditions precedent to Lenders' recovery have been performed, have occurred, or have been waived.

## APPLICATION FOR TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

38.     The factual allegations above are incorporated herein.

39.     Pursuant to FED. R. CIV. P. 65, Lenders ask this Court to issue a temporary restraining order and preliminary injunction prohibiting Borrowers and Guarantors, including Michael Lockwood, from interfering with Lenders' rights to the collateral.

### BORROWERS INSTRUCT ACCOUNT DEBTORS TO DIVERT PAYMENTS

40.     As stated above, the Indebtedness was accelerated on November 27, 2017, and Borrowers have failed to pay the Indebtedness, and do not have the financial ability to pay the Indebtedness. Under the Security Agreement and Security Agreement Joinder, Borrowers and Guarantors pledged a broad range of assets as collateral for the Indebtedness. *Security Agreement* at § 2, ***Exhibit 8***. Among the various types of collateral pledged, Borrowers and Guarantors pledged inventory and accounts receivable (the "Inventory Collateral" and the "Receivables Collateral," respectively). *Id.* at §§ 2(a), (o).

41.     On December 1, 2017, Wells Fargo sent a letter to Borrowers' fifty largest account debtors (based on information provided by Borrowers) informing them that all amounts due to Borrowers should be deposited in a Wells Fargo account, which was specified in the letter.  A true and correct copy of the December 1, 2017 letter is attached hereto as *Exhibit 13*. On December 11, 2017, Wells Fargo sent a similar letter to the remainder of Borrowers' account debtors (once again, based on information provided by Borrowers).  A true and correct copy of the December 11, 2017 letter is attached hereto as *Exhibit 14*.

42.     Shortly after sending the notices to account debtors, Wells Fargo learned that on November 17, 2017, LII had sent a letter to its account debtors changing its long-standing remittance instructions for Receivables Collateral Proceeds and instructing them to send payments to a Bank of America deposit account maintained by LII.  A true and correct copy of the November 17 letter is attached hereto as *Exhibit 15*.  As set forth in the First and Second Forbearance Agreements, LII was required to cause all its collections to be deposited in an account maintained by Wells Fargo, and was prohibited from opening or maintaining a deposit account at any other financial institution.  *First Forbearance Agreement* at § 5(c), *Exhibit 10*; *Second Forbearance Agreement* at § 6(c), *Exhibit 11*; *see also Security Agreement* at § 5(j)(iv), *Exhibit 8*.  Moreover, upon information and belief, LII has advised at least one of its account debtors that it will indemnify the account debtor in the event Wells Fargo pursues the account debtor for remitting payments to LII instead of Wells Fargo.   Thus, Borrowers are clearly interfering with Lenders' rights to the Receivable Collateral and the proceeds thereof by diverting funds and encouraging account debtors to violate their duties and obligations to turn over funds to Wells Fargo.

## Borrowers Misappropriate Inventory Collateral

43.    Furthermore, on December 18, 2017, Wells Fargo learned that LII entered into an agreement with one of its other creditors, Global Stainless Supply ("Global Stainless"), whereby LII agreed to transfer portions of the Inventory Collateral to Global Stainless in satisfaction of LII's debt to Global Stainless.  Such transfers are direct violations of the Credit Agreement and diminish and jeopardize Lenders' collateral.   The Credit Agreement provides that Inventory Collateral may not be disposed of outside of the ordinary course of business, unless the disposal falls within one of six enumerated exceptions. *Credit Agreement* at §§ 1.1 ("Asset Disposition" definition), 8.5, *Exhibit 1*.  LII is in the business of selling valves and industrial parts for profit; transferring its inventory to debtors in satisfaction of LII's debt is neither in the ordinary course of its business nor does it fall under one of the Credit Agreement's enumerated exceptions for Asset Disposition.  By trading Lenders' Inventory Collateral, without Lenders' knowledge or consent, to pay off third-party debtors, LII is actively depleting the collateral available to satisfy Lenders' debt.

## Cease and Desist Letters

44.    Upon learning of Borrowers' efforts to interfere with and divert Lenders' collateral, on December 14, 2017, Wells Fargo delivered a letter to Borrowers demanding that they immediately cease and desist from interfering with Lenders' rights to the Receivable Collateral.  A copy of the December 14th cease and desist letter is attached as *Exhibit 16*.  In the letter, Wells Fargo demanded certain documents and assurances from Borrowers, including assurances that they will immediately remit any and all payments sent to Borrowers, and that they have not, and will not interfere with Lenders' rights as to all collateral.  Borrowers refused and failed to provide the requested assurances.  Instead, LII indicated that it intended to collect receivables outside of Wells Fargo and to use the funds to pay its suppliers.  Notably also, LII

admitted that it had received $650,000 outside of Wells Fargo and that it had not deposited the funds in the Wells Fargo account.  Thus, LII has confirmed its intent to continue interfering with and depleting Lenders' collateral.

45.     Additionally, upon learning that LII was using inventory to pay down its debts, Wells Fargo sent another cease and desist e-mail on December 18, 2017 demanding that LII immediately cease and desist from depleting and disposing of the Inventory Collateral, including transferring Inventory Collateral to LII's creditors to repay LII's debts.   A copy of the December 18th cease and desist e-mail is attached as *Exhibit 17*.  Wells Fargo demanded that LII provide and disclose an accounting of all inventory wrongfully transferred.  LII has failed to respond to the demand and request.

46.     Due to LII's and Borrowers' precarious financial condition and apparent insolvency, the Receivable Collateral and Inventory Collateral are the most likely source for repayment of the debt.

47.     Unless restrained and ordered as prayed for herein, Borrowers, and in particular LII and Michael Lockwood, will likely continue to interfere with Lenders' rights to their collateral, thereby further injuring Lenders and their ability to obtain repayment of the debt. Furthermore, Borrowers will suffer no meaningful detriment as a result of injunctive relief.  They have no right to retain any of the collateral given their default under the Credit Agreement and Notes.

## THE LOAN DOCUMENTS AND APPLICABLE LAW SUPPORT INJUNCTIVE RELIEF

48.     The Security Agreement grants Lenders, upon the occurrence of an Event of Default, the right to resort to any or all security for any credit and to exercise any or all of the rights of a secured party pursuant to applicable law:

(a)  <u>General Remedies</u>.  Upon the occurrence of an Event of Default and during the continuation thereof, the Administrative Agent shall have . . . the rights and remedies of a secured party under the Uniform Commercial Code of the jurisdiction applicable to the affected Collateral and, further, the Administrative Agent may . . . (i) enter on any premise on which any of the Collateral may be located and, without resistance or interference by the Grantors, take possession of the Collateral, (ii) dispose of any Collateral on any such premises, (iii) require the Grantors to assemble and make available to the Administrative Agent at the expense of the Grantors any Collateral at any place and time designated by the Administrative Agent that is reasonably convenient to both parties, (iv) remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof, and/or (v) without demand and without advertisement, notice, hearing or process of law, all of which each of the Grantors hereby waives to the fullest extent permitted by Applicable Law, at any place and time or times, sell and deliver any or all Collateral held by or for it at public or private sale, by one or more contracts, in one or more parcels, for cash, upon credit or otherwise, at such prices and upon such terms as the Administrative Agent deems advisable, in its sole discretion . . . .

*Security Agreement* at § 8(a), ***Exhibit 8***.  Specifically, as it relates to the Receivable Collateral,

the Security Agreement provides:

(b)  <u>Remedies Relating to Accounts</u>.  Upon the occurrence of an Event of Default and during the continuation thereof . . . (i) each Grantor will promptly upon request of the Administrative Agent instruct all account debtors to remit all payments in respect of Accounts to a mailing location selected by the Administrative Agent and (ii) the Administrative Agent shall have the right to enforce any Grantor's rights against its customers and account debtors, and the Administrative Agent or its designee may notify (or require any Grantor to notify) any Grantor's customers and account debtors that the Accounts of such Grantor have been assigned to the Administrative Agent or of the Administrative Agent's security interest therein, and may (either in its own name or in the name of such Grantor or both) demand, collect (including, without limitation, by way of a lockbox arrangement), receive, take receipt for, sell, sue for, compound, settle, compromise and give acquittance for any and all amounts due or to become due on any Account, and, in the Administrative Agent's discretion, file any claim or take any other action or proceeding to protect and realize upon the security interest of the Secured Parties in the Accounts.  Each Grantor acknowledges and agrees that the Proceeds of its Accounts remitted to or on behalf of the Administrative Agent in accordance with the provisions hereof shall be solely for the Administrative Agent's own convenience and that such Grantor shall not have any right, title, or interest in such Accounts or in any such other amounts except as expressly provided herein.

*Id.* at § 8(b).

49.     Furthermore, Borrowers and Lenders specifically contemplated the propriety of injunctive relief in the Credit Agreement, providing that in the event that any of the Borrowers fail to perform, observe, or discharge any of their obligations or liabilities, Lenders may seek temporary or permanent injunctive relief without the need to prove actual damage or the inadequacy of other relief:

> SECTION 11.8      Injunctive Relief.  The Borrowers recognize that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy of law may prove to be inadequate relief to the Lenders.  Therefore, each Borrower agrees that the Lenders, at the Administrative Agent and the Lenders' option, shall be entitled to seek temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

Credit Agreement, *Exhibit 1*.

## APPLICABLE LEGAL STANDARDS SUPPORT LENDERS' ENTITLEMENT TO RELIEF

50.     Unless restrained, Borrower will likely continue to interfere with Lenders' rights to their collateral and potentially dispose of or abscond with the collateral, thereby further injuring Lenders and their ability to obtain repayment.   Lenders are entitled to a temporary restraining order under principals of equity and under the statutes and jurisprudence of the United States, in the form of a prohibitory and mandatory restraint and injunction.   In order to obtain a temporary restraining order, a party must show that (1) it faces irreparable injury; (2) there is no adequate remedy at law; (3) it has a likelihood of success on the merits; (4) the balance of hardships favors the injunctive relief; and (5) the injunctive relief will not adversely affect the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Here, Lenders are able to meet each of those elements, and therefore, Borrowers and Guarantors should be ordered to:

> i.      Refrain from interfering with Lenders' rights to take immediate possession of all Collateral (as defined in the Security Agreement), wherever located, and books and records pertaining thereto;

ii.   Refrain from disposing of, transferring, removing, hiding or altering any Collateral (as defined in the Security Agreement), wherever located, and books and records pertaining thereto;

iii.  Refrain from using any Collateral (as defined in the Security Agreement) to pay or offset Borrowers or Guarantors' debt(s) to third parties;

iv.   Refrain from advising or instructing any of Borrowers' account debtors or customers to send payments to Borrowers or anyone other than Wells Fargo;

v.    Prepare and produce to Wells Fargo, within three (3) business days an accounting of all inventory transferred to any third parties to pay or offset Borrowers or Guarantors' debts, including the identity of the third parties, the debt amount, the date of transfer, and the amount and value of the transferred inventory;

vi.   Prepare and produce to Wells Fargo, within three (3) business days an accounting of all accounts receivable sent directly to Borrowers and/or any financial institution other than Wells Fargo including the identity of the account debtor, the amount paid, the date of the payment, the financial institution and account number into which the payment was deposited, and Borrowers' use of funds.

vii.  Prepare and produce to Wells Fargo, within three (3) business days, a current list of all collateral (as defined in the Security Agreement), wherever located, including but not limited to, the location thereof;

viii. Prepare and produce to Wells Fargo, within three (3) business days, a current list of all deposit accounts maintained by LII and amounts on deposit in each account;

ix.   Transfer to a deposit account of Wells Fargo's specification, within three (3) business days, all collateral proceeds and other amounts held in any deposit accounts maintained at financial institutions other than Wells Fargo, and turn over any future deposits.

51.   Lenders will suffer immediate and irreparable injury, loss, or damage if Borrowers and, as applicable, their officers, directors, agents, servants, employees, managers, and representatives are not immediately enjoined.  Specifically, Borrowers' actions described above, including its transfer of Inventory Collateral to third-parties, its unauthorized diversion of collateral proceeds to deposit accounts at financial institutions other than Wells Fargo, its blatant efforts to divert account receivable payments to said deposit account, coupled with Borrower's

apparent insolvency, reflect the injury and harm Lenders face.  Borrowers are in default of more than $57 million of debt to Lenders, with little apparent ability to satisfy the debt or answer in a money judgment.  An injury is irreparable if the opposing party will be unable to pay damages due to its own insolvency.  *Amegy Bank N.A. v. Monarch Flight II, LLC*, 2011 U.S. Dist. LEXIS 140874, at *17-19 (S.D. Tex. Dec. 7, 2011); s*ee also, Hughes Network Sys. v. Interdigital Comm'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).  Accordingly, it is critical that Lenders secure the collateral in order to ensure they can recover funds to pay the indebtedness.

52.     Based on the foregoing, it is probable that Lenders will recover from Borrowers after a trial on the merits for their causes of action.  The Credit Agreement and Notes are clear and unequivocal, and Lenders will be able to establish that each and every action by Borrowers complained of in its counterclaim and third-party claims are in direct contravention of such contracts and applicable law.  Borrowers acknowledged in the First Forbearance Agreement and the Second Forbearance Agreement that they were in default of the Credit Agreement and Notes. There is no contesting that the outstanding debt is due and owing and that Borrowers and Guarantors have failed to pay it.  However, a judgment for damages will be an inadequate remedy because Borrowers do not have the financial ability to pay money damages, and thus, without the issuance of the requested injunctive relief, there is no adequate remedy at law.

53.     Lastly, the injury that Lenders face outweighs any injury to Borrowers by granting the injunctive relief and the injunctive relief would not adversely affect public policy or interest.  Borrowers freely contracted with Lenders to pledge their collateral as security for a $72 million line of credit.  By failing to adhere to their obligations under that line of credit, Lenders

have a superior right to the collateral, and public policy supports enforcing collateral rights of secured lenders.

54.    Borrowers' failure and refusal to pay the amounts due and owing under the Credit Agreement and Notes and their failure to comply with their obligations relating to Lenders' collateral, reflect that in the absence of injunctive relief, Borrowers will continue to make unavailable to Lenders their collateral, may dispose of the collateral, and Lenders will lose the primary sources for repayment of the indebtedness owed to Lenders.  Consequently, in order to avoid irreparable injury, Lenders seeks a temporary restraining order as set forth above.

55.    Lenders additionally request that, after issuing a temporary restraining order, the Court set Lenders' application for hearing, and upon completion of said hearing, enter a preliminary injunction providing the same relief set forth in the temporary restraining order.

56.    Lenders are willing to post a bond if so required by the Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Counterclaimants and Third-Party Plaintiffs, Wells Fargo and Trustmark, respectfully pray that Third-Party Defendants Lockwood Enterprises, Inc., LMG Manufacturing, Inc., Piping Components, Inc., Lockwood Holdings, Inc., LH Aviation, LLC, 7807 Eagle Lane LLC, and Michael F. Lockwood be cited to appear, and that upon a trial on the merits, Wells Fargo and Trustmark have judgment against LII and Third-Party Defendants, jointly and severally, for all amounts owed under the Loan Documents, and for pre- and post-judgment interests, costs, and Wells Fargo and Trustmark's attorney fees and expenses.

Furthermore, Lenders pray that the Court grant their application for a temporary restraining order and enter an order restraining Borrowers, Guarantors and their officers, agents, servants, employees, attorneys, or those in active concert or participation with any of them, or with actual knowledge of the Order, ordering the relief outlined herein in paragraph 50.

Lenders further pray that the Court set the application for a preliminary injunction for hearing, and that after such hearing, the Court enter a preliminary injunction to the same effect as its temporary restraining order.  Wells Fargo and Trustmark further pray for all other relief to which they are entitled.

Respectfully submitted,

By:   */s/ Yasmin Atasi*
    Yasmin Atasi
    State Bar No. 10435150
    yatasi@winstead.com
    Scott F. Courtney Jr.
    State Bar No. 24084384
    scourtney@winstead.com
    Angela Kao
    State Bar No. 24105652
    akao@winstead.com
    WINSTEAD PC
    600 Travis Street, Suite 5200
    Houston, Texas 77002
    (713) 650-8400
    (713) 650-2400 (Fax)

    **ATTORNEYS FOR DEFENDANTS, COUNTERCLAIMANTS, AND THIRD PARTY PLAINTIFFS, WELLS FARGO BANK, N.A., WELLS FARGO SECURITIES, LLC, AND TRUSTMARK NATIONAL BANK.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of December, 2017, a copy of the foregoing, and all exhibits and attachments thereto, was served on all counsel of record via the Court's ECF system.

*/s/ Yasmin Atasi*
Yasmin Atasi

## **VERIFICATION**

STATE OF TEXAS                             §
                                           §
COUNTY OF DALLAS                           §

    BEFORE ME, the undersigned authority, on this day personally appeared Jennifer L. Norris, who after being duly sworn, did upon her oath depose and state that she is a Senior Vice President, Credit Resolution Group with Wells Fargo Bank, N.A., is authorized to provide this verification on behalf of Wells Fargo Bank, N.A., that she has read the foregoing Counterclaim, Third-Party Claims, and Application for Temporary Restraining Order and Preliminary Injunction, and that each of the facts contained therein is true and correct based on her personal knowledge.

_____

JENNIFER L. NORRIS

    SUBSCRIBED AN SWORN TO BEFORE ME on this the 22ᵗʰ day of December, 2017, to certify which witness my hand and seal of office.

_____

Notary Public in and for
the States of Texas

My commission expires: 6-16-2018